UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JOHN MCNEAL,

        Plaintiff,

v.

MYCOTECHNOLOGY, INC., a Delaware corporation,

        Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, John McNeal, by and through his attorneys, HKM Employment Attorneys, LLP, for his Complaint and Jury Demand against MycoTechnology, Inc. ("Defendant" or the "Company"), states and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's failure to accommodate, discrimination toward and termination of Plaintiff because of his actual and/or perceived disability (back condition, knee injury requiring surgery), in violation of the Americans with Disabilities Act, as amended ("ADA") and the Family and Medical Leave Act ("FMLA").

2. More specifically, Plaintiff began working for Defendant on July 23, 2019. Plaintiff had a long-standing, painful back condition that eventually caused his right leg to drag when he walked. However, Plaintiff was still able to perform his essential job functions and, up until the day of Plaintiff's termination on his one-year anniversary, July 23, 2020, Plaintiff had

1

never received any discipline during his employment with Defendant, whether formal or informal.

3. In early July 2020, if not sooner, Plaintiff informed Defendant he would need to undergo a spinal fusion surgery, which was not yet scheduled. On July 17, 2020, Plaintiff tore the ACL ligament in his left knee outside of work. On July 18, 2020, Plaintiff overslept due to the medication to treat his knee injury and he notified his supervisor of same. Plaintiff still went to work that day. When Plaintiff arrived at work, his supervisor sent him home, saying Plaintiff could not work on his knee or it would get worse.

4. The next day, July 19, 2020, Defendant called Plaintiff and informed him that he was being placed on a three-day, unpaid suspension due to the supposed "no-call, no-show" that happened the day prior. On July 20, 2020, Plaintiff was advised by his doctor to try approximately four weeks of therapy to treat his knee before potentially resorting to surgery.

5. On July 23, 2020, the day Plaintiff became eligible under the FMLA, Plaintiff went to work on crutches. As soon as he arrived, Plaintiff's supervisor and Defendant's Plant Manager gave Plaintiff his first written warning for the supposed "no-call, no-show," which was backdated to July 9, 2020. Plaintiff signed the write-up and informed the Company that his doctor had advised him to treat his knee with therapy for a few weeks before resorting to surgery. Plaintiff's supervisor told Plaintiff he would not be able to find coverage for Plaintiff during that time. Then, Defendant's Plant Manager started asking Plaintiff about his back condition.

6. Defendant's Plant Manager claimed management had noticed Plaintiff having difficulty walking around lately and started asking Plaintiff about his back surgery that was not yet scheduled. Defendant's Plant Manager asked, "Do you really think you can come back after that?" Defendant also incorrectly told Plaintiff he would not be entitled to FMLA leave for the

surgery. Still referring to Plaintiff's back condition, Defendant's Plant Manager eventually said, "We don't feel like you can come back and do your job. It's best that we part ways."

## PARTIES

7. At all times relevant, Plaintiff is and was a resident of Colorado.

8. At all times relevant, Defendant MycoTechnology, Inc. is and was a Delaware corporation with a principal street address located at 18250 E 40th Avenue, Suite 50, Aurora, Colorado 80011.

9. Plaintiff was employed by Defendant in Colorado from approximately July 23, 2019 through his termination on July 23, 2020. During the time Plaintiff worked for Defendant as a temporary employee placed at Defendant's place of business through a staffing agency, PrimeSource Staffing, between approximately July 23, 2019 and approximately October 21, 2019, Defendant was Plaintiff's joint employer for purposes of the Family and Medical Leave Act ("FMLA") and 29 C.F.R. § 825.106.

10. For example, between approximately July 23, 2019 and approximately October 21, 2019, Defendant exercised control over the work and working conditions of Plaintiff, which simultaneously benefited Defendant and PrimeSource Staffing. *See* 29 C.F.R. § 825.106 ("[J]oint employment will ordinarily be found to exist when a temporary placement agency supplies employees to a second employer."); *Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1148 (10th Cir. 2004) (explaining that "Section 825.106(a) states that two entities may be considered 'joint employers' where they both exercise some control over the work or working conditions of the employee" and that "joint employment will ordinarily be found to exist when a temporary agency supplies employees to a second employer."). Defendant set Plaintiff's hours,

3

approved his overtime, supervised his work, and had the power to terminate him during the timeframe in which he worked for Defendant as a temporary employee.  Plaintiff worked at Defendant's premises, was trained by Defendant, took direction from Defendant's managers, and was evaluated by Defendant; which led to Defendant deciding to hire Plaintiff and become his sole, direct employer on or about October 21, 2019.

11. Therefore, on the day of his termination, July 23, 2020, Plaintiff was an "eligible employee" under the FMLA, 29 U.S.C. § 2611(2)(A), because he was employed by Defendant, either as a joint employer or sole employer, from July 23, 2019 until July 23, 2020.

## JURISDICTION AND VENUE

12. Plaintiff incorporates by reference the above paragraphs as though set forth separately and fully herein.

13. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

15. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

16. Plaintiff filed his Charge of Discrimination Numbers 32A-2021-00330 and E2100011179 with the Equal Employment Opportunity Commission ("EEOC") and Colorado Civil Rights Division ("CCRD"), respectively, for disability discrimination and retaliation against Defendant on or about January 21, 2021.  Plaintiff was issued a Notice of Right to Sue from the

EEOC on August 26, 2021, and Plaintiff has filed the present action within ninety (90) days of receipt of same.

17. Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

18. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

19. Plaintiff began working for Defendant as a temporary employee on or about July 23, 2019. Defendant was Plaintiff's joint employer at this time. Defendant hired Plaintiff as a full-time Production Operator on or about October 21, 2019, when Defendant became Plaintiff's sole, direct employer.

20. At all times during his employment with Defendant, Plaintiff met or exceeded the Company's legitimate performance expectations.

21. Plaintiff was an otherwise qualified person with a disability within the meaning of the ADA at the time of his eventual termination on July 23, 2020, in that Plaintiff had one or more actual and/or perceived disabilities that were neither transitory nor minor. For example, at the time of Plaintiff's termination, Plaintiff suffered from a painful back condition that had lasted more than six months. Without taking into account ameliorative measures, such as medication and learned behavioral modifications, Plaintiff's back condition substantially limited Plaintiff's ability to perform one or major life activities, including Plaintiff's ability to walk, as compared to the general population.

22. During his employment with Defendant, Plaintiff was receiving injections in his back to treat the long-standing pain he endured; however, the relief provided by the treatments

typically only lasted for approximately three months. Plaintiff's back treatments would cause Plaintiff incapacitation for a couple days following the treatments. Plaintiff therefore made a point to schedule his treatments to coincide with days that he was already scheduled to be off from work.

23. Eventually, Plaintiff's right leg began to drag when he walked due to his back condition, causing a noticeable limp.

24. Plaintiff later learned that a disc in his spine had slipped out of place and was pinching a nerve, causing his leg to drag.

25. Defendant knew about Plaintiff's painful and worsening back condition at the time of his termination. For example, in early July 2020, or prior thereto, Plaintiff disclosed to Defendant that he would need to undergo spinal fusion surgery, which was not yet scheduled.

26. Despite Plaintiff's painful back condition, he continued to perform his job, including lifting 50-pound bags when necessary, climbing ladders, and otherwise performing all of his essential job functions.

27. On or about July 17, 2020, Plaintiff tore his ACL in his knee outside of work.

28. On or about July 18, 2020, Plaintiff overslept due to the medication he had to take to treat his painful knee injury. Plaintiff notified his supervisor about his injury and that his medication had caused him to oversleep. Plaintiff still went to work on July 18, 2020.

29. When Plaintiff arrived at work on July 18, 2020, the Company told Plaintiff, "There's no way you can work with your knee like that." Plaintiff was told that his knee would get worse if he tried to work on it and sent home.

30. The next day, on or about July 19, 2020, the Company informed Plaintiff he was being suspended for three days because he had purportedly been a "no-call, no-show" the day

prior.

31.     On or about July 20, 2020, Plaintiff obtained medical treatment and was advised to try therapy for four weeks before potentially resorting to surgery to repair his knee injury.

32.     On or about July 23, 2020, Plaintiff returned to work on crutches and was given his first written warning for purported attendance issues.  The warning was backdated to July 9, 2020, though Plaintiff was only presented with the document to sign on July 23, 2020.  In the warning, Plaintiff was accused of being a "no-call, no-show" on July 18, 2020.  The warning also referenced a purported "no-call, no-show" on April 21, 2020.  However, on that day, Plaintiff had notified his supervisor that he could not be at work due to an emergent situation related to his wife's medical condition.  At no time did Plaintiff's supervisor take issue with this absence prior to Plaintiff being presented with his first written warning on July 23, 2020.

33.     Plaintiff had never received any prior written discipline.

34.     During the conversation when Plaintiff was presented with his first written warning on July 23, 2020, Plaintiff notified the Company's Plant Manager, Ross Cornelissen, and Plaintiff's supervisor, John Troutman, that Plaintiff's doctor recommended that he receive four weeks of therapy to try to recover from his knee injury before resorting to knee surgery.

35.     Troutman told Plaintiff they did not have the coverage to cover him for his four weeks of therapy.  Cornelissen then said, "We've noticed you've been having a hard time walking around lately;" and started asking about Plaintiff's back condition.  Cornelissen asked Plaintiff about his back surgery and said, "Do you really think you can come back after that?"  Defendant also told Plaintiff that he would not qualify for leave under the Family and Medical Leave Act for his as yet unscheduled back surgery; though this was not true, Plaintiff became eligible the day of

7

his termination, on July 23, 2020.

36. Plaintiff was again told by Cornelissen that management had noticed Plaintiff appear to struggle with walking around due to his limp. Cornelissen told Plaintiff, "We don't feel like you can come back and do your job. It's best that we part ways."

37. Troutman then left and retrieved Plaintiff's personal items. Before Plaintiff left the premises, Troutman told Plaintiff, "You have every right to be upset."

38. Without offering Plaintiff any position modifications or alternative accommodations that would have allowed him to continue working or return to work in the near future, Defendant terminated Plaintiff because of his actual and/or perceived disability, and/or because he requested an accommodation related to same.

39. At no time was Plaintiff told that his termination was due to the supposed "no-call, no-show" on July 18, 2020, or any other attendance issue unrelated to Defendant's prejudiced view that Plaintiff would be unable to return to work due to his disabling medical condition(s).

40. In an email purportedly documenting the termination meeting that took place on July 23, 2020, Ross Cornelissen admitted that, during that meeting, he discussed Plaintiff's "physical ability to perform the job." Cornelissen also claimed Plaintiff had purportedly "required help to perform physical duties (i.e. – lifting raw material bags weighing up to 50 lbs, going up ladders, bending/kneeling)[.]" Cornelissen also confirmed he believed Plaintiff had requested the accommodation of a few weeks off work to recover from "his knee situation."

41. When Defendant terminated Plaintiff, it also immediately terminated his health insurance benefits so that Plaintiff was not able to get the back surgery or the knee therapy and surgery he needed to recover from his knee injury.

42. Plaintiff's knee injury did not resolve for more than a six-month duration. Plaintiff was eventually scheduled to undergo knee surgery on November 5, 2020, which took in excess of two months of recovery.

43. Plaintiff underwent a spinal fusion surgery, which involved placing two rods and screws in his spine, on or about May 5, 2021. Plaintiff continues to receive medical care for his continuing back pain, though he is able to and does currently work a physically demanding job.

## FIRST CLAIM FOR RELIEF
**(Disability Discrimination and Failure to Accommodate in Violation of Section 102(a) and (b)(5)(A) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and (b)(5)(A))**

44. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

45. At the time of Plaintiff's termination, Plaintiff was a disabled person within the meaning of the ADA.

46. Plaintiff suffered from one or more physical impairments which, without ameliorative measures, substantially limited one or more major life activities as compared to the general population, including walking.

47. Though Plaintiff suffered from one or more disabling medical conditions at the time of his termination, Plaintiff was qualified for his job and capable of performing the essential functions of his position with reasonable accommodations.

48. At the time of Plaintiff's termination, Plaintiff was also regarded as being disabled by Defendant.

49. Defendant perceived Plaintiff as being substantially limited in his ability to work due to his medical condition(s), when Plaintiff was not so limited.

50. Defendant discriminated against Plaintiff because of his actual and/or perceived disability by subjecting him to disparate terms, conditions and privileges of employment, including by subjecting him to fabricated discipline, suspending Plaintiff, and terminating Plaintiff's employment, in violation of the ADA.

51. Defendants further discriminated against Plaintiff because of his disabling medical condition(s) by denying Plaintiff reasonable accommodation and failing to engage in an interactive process calculated to develop a reasonable accommodation for Plaintiff prior to terminating Plaintiff. Such reasonable accommodation would have permitted Plaintiff to perform the essential functions of his position at the time of his termination or in the near future and would not have imposed any undue hardship on Defendant.

52. The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his actual and/or perceived disability, and/or Defendant's refusal to accommodate Plaintiff or engage in the interactive process in good faith.

53. Defendant's above-described conduct was intentional.

54. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally protected rights.

55. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))

56. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

57. In July 2020, Plaintiff engaged in multiple instances of protected activity under the ADA, and Plaintiff was retaliated against as a result. For example, in or around July 2020, Plaintiff informed Defendant that he would require time off work to undergo spinal fusion surgery and recovery from same. On or about July 17, 2020, Plaintiff further engaged in protected activity when he informed Defendant of his on-the-job injury and took time off work related to same. On the day of Plaintiff's termination, on July 23, 2020, Plaintiff further requested accommodation when he informed Defendant he would need to undergo therapy for his on-the-job knee injury, after which he may require time off to undergo knee surgery. That same day, he also reiterated his need and request for time off to undergo spinal fusion surgery and recover from same. In making these requests and notifying Defendant of Plaintiff's present and upcoming need for accommodation, Plaintiff was engaging in activity protected under the ADA.

58. Defendant retaliated against Plaintiff after he engaged in the above-described protected activity by, *inter alia*, subjecting him to fabricated discipline, suspending Plaintiff, and terminating Plaintiff's employment.

59. These are consequences that would tend to discourage similarly situated employees from requesting accommodations related to a protected medical condition.

60. Defendant's above-described conduct was intentional.

61. Defendant's above-described conduct was done with malice or with reckless indifference to Plaintiff's federally protected rights.

11

62. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and he is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

**THIRD CLAIM FOR RELIEF**
**(Interference in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*)**

63. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

64. The FMLA's purpose is to address the problem of "inadequate job security for employees who have serious life conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1).

65. Defendants operate in interstate commerce and have over 50 employees within a 75-mile radius of the location where Plaintiff was employed. Defendants are therefore a "covered employer," as defined at 29 U.S.C. § 2611(4) under the FMLA.

66. Plaintiff was an "eligible employee" entitled to the protections of the FMLA when his need for leave arose.

67. Plaintiff was qualified to obtain leave under the FMLA in that he had one or more serious health conditions.

68. By subjecting Plaintiff to fabricated discipline, suspending Plaintiff, and terminating Plaintiff's employment, Defendant violated 29 U.S.C. § 2615(a)(1) by unlawfully interfering with Plaintiff's right to protected medical leave under the FMLA.

69. Defendant terminated Plaintiff to prevent the exercise of his right to take protected

medical leave under the FMLA.

70. Defendant's violations of the FMLA were willful and without justification.

71. Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

72. Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

## FOURTH CLAIM FOR RELIEF
### (Retaliation in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*)

73. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

74. Plaintiff engaged in a protected activity by notifying Defendant of his need to take leave under the FMLA.

75. Defendant took actions that a reasonable employee would have found materially adverse by subjecting Plaintiff to fabricated discipline, suspending Plaintiff, and terminating Plaintiff's employment.

76. Defendant's violations of the FMLA were willful and without justification.

77. Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

78. Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages including, but not limited to, those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B. Liquidated damages under the FMLA;

B. Punitive damages for all claims as allowed by law;

C. Attorneys' fees and costs of this action;

D. Pre-judgment and post-judgment interest at the highest lawful rate; and

E. Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 22nd day of October, 2021.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Shelby Woods*
　　Claire E. Hunter (39504)
　　Shelby Woods (48606)
　　HKM Employment Attorneys LLP
　　730 17th Street, Suite 750
　　Denver, Colorado 80202
　　chunter@hkm.com
　　swoods@hkm.com
　　*Attorneys for Plaintiff John McNeal*